**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

**DIANE STEVENS, on behalf of
J.H.S,**
         **Plaintiff,**

**v.**                                 **Case No. 1:13-cv-33196**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

         **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks review of the final decision of the Commissioner of Social Security denying the Claimant's application for children's Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. The matter is assigned to the Honorable David A. Faber, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' Motions for Judgment on the Pleadings as articulated in their respective briefs. (ECF Nos. 15, 16).

The undersigned has fully considered the evidence and arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **DENIED;** that the Commissioner's motion for judgment on the pleadings be **GRANTED;** that the decision of the Commissioner be

**AFFIRMED**; and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.   <u>Procedural History</u>

Plaintiff, J.H.S. (hereinafter referred to as "Claimant"), through his mother, Diane Stevens, filed an initial application for children's SSI benefits on February 9, 2009, alleging a disability onset date of January 28, 2009. (Tr. at 117). This application progressed through the various levels of review and was ultimately denied by an Administrative Law Judge ("ALJ") through written decision dated December 18, 2009. (Tr. at 117-130). The ALJ's decision was affirmed by the Appeals Council and became the final decision of the Commissioner for the period ending December 18, 2009. (Tr. at 136-138).

On February 16, 2010, Claimant, again through his mother, filed a second application for children's SSI, once more alleging a disability onset date of January 28, 2009, based upon "ADHD [attention deficit hyperactivity disorder], asthma, scoliosis, autism, depression, and anxiety." (Tr. at 266, 317). The claim was denied initially and upon reconsideration. (Tr. at 32). Claimant timely requested a hearing, which took place on May 31, 2012 before the Honorable Steven A. De Monbreum, ALJ. (Tr. at 53-63). Realizing that the record was incomplete, the ALJ recessed the hearing to allow additional testing of Claimant and to reconcile some conflicts in the record. (*Id.*). The administrative hearing reconvened on September 5, 2012, during which Claimant's mother and an independent medical expert, Dr. Charles Holland,[1] provided testimony, and the record was supplemented. (Tr. at 64-113). By decision dated September 21, 2012, the ALJ determined that Claimant was not disabled under the Social Security Act.

---

[1]  Incorrectly identified as Dr. Charles Collin in the transcript .

(*Id.* at 32-50). The ALJ's decision became the final decision of the Commissioner on November 25, 2013, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6). On December 24, 2013, Claimant brought the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and the Transcript of Proceedings, and both parties have fully briefed the issues. (ECF Nos. 8, 9, 15, 16, 17). Therefore, this matter is ready for resolution.

## II.   **The Sequential Process and the ALJ's Decision**

A child is disabled under the Social Security Act if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). The regulations require the ALJ to determine a child's disability using a three step sequential evaluation process. 20 C.F.R. § 416.924(a). At the first step, the ALJ must determine whether the child is engaged in substantial gainful activity. *Id.* If the child is, he or she is found not disabled. *Id.* If the child is not, the second inquiry is whether the child has a medically determinable impairment, or a combination of impairments, that is severe. *Id.* For a child, a medically determinable impairment or combination of impairments is considered *not* severe if it constitutes only a "slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations." *Id.* at § 416.924(c). If a severe impairment is present, the third and final inquiry is whether such impairment meets or medically equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 ("the Listings"). *Id.* at § 416.924(a) and (d).  Although an impairment may not, on its

face, meet or medically equal a listed impairment, it is considered to be of listing-level severity when the impairment is the functional equivalent of a listed impairment. 20 C.F.R. §§ 416.924(a), 416.926a(a). If the claimant's impairment meets, medically equals, or functionally equals an impairment in the Listing, the claimant is found disabled and is awarded benefits. 20 C.F.R. §§ 416.924(a), 416.926a. If it does not, the claimant is found not disabled.

To determine functional equivalence, the regulations require the ALJ to evaluate the limitations resulting from the child's impairment under six broad domains of functioning, including:

(1) Acquiring and using information;
(2) Attending and completing tasks;
(3) Interacting and relating to others;
(4) Moving about and manipulating objects;
(5) Caring for yourself; and
(6) Health and physical well-being.

*Id.* at 416.926a(b)(1); Social Security Ruling ("SSR") 09-1p. If the child has "marked" limitations in two of the six domains, or "extreme"[2] limitations in one of them, the

---

[2]  20 C.F.R. § 416.926a(e) defines "marked" and "extreme" limitations, in relevant part, as follows:

[Y]ou have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning ... [found] on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

[Y]ou have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Extreme" limitation also means a limitation that is "more than marked." "Extreme" limitation is the rating [given] to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning ... [found] on standardized testing with scores that are at least three standard deviations below the mean.

child's impairment will functionally meet a listing. *Id.* at 416.926a(d). "This technique for determining functional equivalence accounts for all of the effects of a child's impairments singly and in combination—the interactive and cumulative effects of the impairments—because it starts with a consideration of actual functioning in all settings." SSR 09-1p. The SSA calls this technique the "whole child" approach. *Id.*

In this particular case, the ALJ determined that Claimant satisfied the first inquiry, because he was an adolescent and had never engaged in substantial gainful activity. (Tr. at 35, Finding No. 2). The alleged disability onset date of January 28, 2009 was amended at the hearing to December 19, 2009, one day after the prior decision denying SSI benefits. (Tr. at 32). Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of "learning disorder; attention deficit hyperactivity disorder (ADHD); oppositional defiance disorder; anxiety disorder, not otherwise specified; and history of asthma." (Tr. at 35-36, Finding No. 3). The ALJ noted that the severe impairments listed had been indentified as Claimant's latest diagnoses by the West Virginia University Department of Behavioral Medicine and Psychiatry. (Tr. at 36). At the third and final inquiry, the ALJ concluded that Claimant's impairments did not meet, medically equal, or functionally equal the severity level of any impairment contained in the Listing. (Tr. at 36-49, Finding Nos. 4 and 5).   Therefore, Claimant was not under a disability as defined in the Social Security Act and was not entitled to benefits. (Tr. at 49-50, Finding No. 6).

## III.   <u>Scope of Review</u>

While 42 U.S.C. §405(g) "authorizes judicial review of the Social Security Commissioner's denial of social security benefits," *Hines v. Barnhart,* 453 F.3d 559, 561 (4th Cir. 2006), the scope of review is extremely limited. The sole issue before the

court is whether the final decision of the Commissioner denying benefits was "reached through application of the correct legal standard" and is supported by substantial evidence. *Hancock v. Astrue,* 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart,* 434 F. 3d 650,653 (4th Cir. 2005)). The United States Court of Appeals for the Fourth Circuit ('Fourth Circuit') has defined substantial evidence as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When reviewing a final decision for substantial evidence, the court does not evaluate the case *de novo*, *Oppenheim v. Finch,* 495 F.2d 396, 397 (4th Cir. 1974), make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 1996). Furthermore, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." *Hancock,* 667 F.3d at 472. The court's function is to scrutinize the record and confirm that substantial evidence sustains the disability decision. *Hays,* 907 F.2d at 1456. Simply put, the question for the court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson*, 434 F.3d at 653 (citing *Craig v. Chater*, 76 F.3d at 589). Therefore, if substantial evidence exists, the court must affirm the Commissioner's decision "even should the court disagree with [it]." *Blalock*, 483 F.2d at 775.

IV.   **Claimant's Background**

Claimant was just shy of eleven years old at the time the application was filed and was thirteen years old when the administrative hearing was held. (Tr. at 35, 68). Claimant attended seventh grade at the local public school, where he was enrolled in general education classes with special education courses for Mathematics and English only. (Tr. at 68-69).

V.   **Claimant's Challenges to the Commissioner's Decision**

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in three ways, and the Appeals Council committed an additional error when considering whether to review the ALJ's decision. First, Claimant contends that the ALJ improperly discounted the opinions of Dr. L. Andrew Steward, a medical source that had evaluated Claimant on several occasions over time. (ECF No. 15 at 4). Second, Claimant argues that the ALJ gave too much weight to the opinions of Dr. Charles Holland and Dr. Holly Cloonan, two agency consultants who never personally evaluated Claimant. (*Id.*) Finally, Claimant alleges that the ALJ ignored detailed information provided by Claimant's teacher, Mr. Steven French, which was highly relevant to a determination of the severity of Claimant's functional impairments. In Claimant's view, these errors caused the ALJ to underestimate the severity of his limitations in three functional domains and, as a consequence, reach an incorrect disability determination. (*Id.*) In regard to the Appeals Council, Claimant is critical that the Appeals Council did not review and remand the ALJ's decision on the basis of new and material evidence supplied by Claimant and incorporated into the record after the decision was issued. Claimant maintains that these new materials "overwhelmingly corroborated evidence rejected by the ALJ" and

should have triggered a remand so that the ALJ could consider them. (ECF No. 15 at 5).

In response, the Commissioner refutes Claimant's contention that the ALJ improperly weighed the medical source opinions. According to the Commissioner, the ALJ was entitled to give the agency consultants' opinions more weight because they were consistent with the other evidence in the record while Dr. Steward's opinions were not only inconsistent with the rest of the record, they contradicted his own clinical findings. (ECF No. 16 at 17). The Commissioner further argues that the ALJ considered and properly evaluated the nonmedical evidence provided by all of Claimant's teachers, including Mr. French, and by Claimant's mother. Finally, the Commissioner claims that the evidence supplied to the Appeals Council after the ALJ's decision was nothing particularly new. The Commissioner asserts that remand for consideration of new evidence is only necessary if there is a possibility that the evidence might have changed the ALJ's disability determination. Here, the new evidence was either cumulative of evidence already in the record, or corroborative of the ALJ's decision. Accordingly, remand is not appropriate. (*Id.* at 18-19).

## VI.   Relevant Medical Information

The Court has reviewed all evidence of record, including the medical documentation.  To the extent medical information is relevant to the issues in dispute, the undersigned addresses it in the discussion below.

### A.  Treatment Records

On January 12, 2008, Claimant was referred to Dr. L. Andrew Steward, Ph.D., a licensed clinical psychologist practicing in Tazewell, Virginia, for the purpose of a psychological evaluation. (Tr. at 633-635). Claimant was eight years old at the time and was referred by Dr. Patel, his family doctor. Claimant was accompanied to the

8

evaluation by his parents, who reported that Claimant lived with them in Virginia. He had four half-sisters and two half-brothers that he saw occasionally. He attended second grade at the local elementary school and was making failing grades. Claimant was not enrolled in special education classes, although he was in reading and mathematics labs. His progress in school had declined from the prior year when he made average grades. (*Id.*). Claimant's mother reported that Claimant had trouble concentrating on school work; made careless errors; did not listen when spoken to directly; and had to be threatened with punishment to finish his homework. (Tr. at 634). Claimant was easily distracted while doing homework, although he seemed to be able to concentrate better when playing games or watching television.

Claimant's mother described Claimant as having an abundance of energy. She also mentioned that he talked excessively; interrupted others' conversations; had trouble waiting his turn; lost his temper when he did not get his way; argued with his teacher; and blamed others for his mistakes. According to his mother, Claimant was too "hyper" to sleep, getting only about four hours per night. Claimant had no major illnesses, with asthma being his only health concern, and he had never received psychiatric treatment. (*Id.*)

Claimant was observed to be oriented, with a normal mood, normal speech, and no noticeable impairments in thought content. (*Id.*). He reported his hobbies to be playing video games, watching television, and playing with toys. He claimed to have many friends at school. He was not affiliated with any clubs or church activities. (Tr. at 635). Dr. Steward diagnosed Claimant with ADHD, NOS, with oppositional defiant disorder features, asthma, and educational problems. He gave Claimant a Global Assessment of Functioning Score of 61 and recommended that Claimant undergo formal

psychological testing to assist with ruing out the diagnoses.[3] (*Id.*).

The next relevant record in evidence is dated January 26, 2009. On that date, Claimant's mother asked Claimant's family physician to evaluate him for ADHD. (Tr. at 576). She reported that Claimant could not concentrate, could not keep still, and was having problems in school. Claimant's mother indicated that Claimant had been diagnosed with possible ADHD by Dr. Steward in the past; accordingly, the plan was to make an appointment with Dr. Steward for further evaluation. (*Id.*).

On March 31, 2009, Claimant was assessed by Ramonia Kessinger, M.S., Ed.S., a school psychologist, to determine his educational needs. (Tr. at 407-12). At that time, he was enrolled in third grade and was having trouble with reading and reading comprehension. Ms. Kessinger observed that Claimant put forth a good effort at testing, but did better with visual aids than verbal aids. On the Wechsler Intelligence Scale for Children-Fourth Edition ("WISC-IV"), Claimant's general ability index was 93, placing him in the average range. His ability to sustain attention, concentrate, and exert mental control, however, were in the borderline range. (Tr. at 408). According to a teacher questionnaire, six areas of Claimant's adaptive behavior fell within the impaired range. (Tr. at 411). Ms. Kessinger made suggestions regarding ways to teach and engage Claimant to assist with his identified impairments. (Tr. at 411-12).

On April 9, 2009, Claimant returned to Dr. Steward's office for full evaluation

---

[3] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). In the past, this tool was regularly used by mental health professionals; however, in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders*, ("DSM-5"), the GAF scale was abandoned in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM-5 at p. 16. A GAF score of 61-70 indicates the presence of some mild symptoms, but the client is generally functioning pretty well and has some meaningful interpersonal relationships. DSM-IV at 32.

and testing. (Tr. at 474-80). Dr. Steward conducted an interview of Claimant and his mother, and administered several psychological tests. He noted that throughout the evaluation and testing, Claimant was fidgety, distractible, and talkative. He stopped working on tests several times to ask when the testing would be over. (Tr. at 474). Otherwise, he appeared to work diligently; therefore, Dr. Steward felt the test results were valid. (Tr. at 475).

Based on the interviews, Dr. Steward learned that Claimant was ten years old and in third grade at the local elementary school. His grades were poor, and he had been held back in kindergarten. His biggest problems included an inability to sit still in class, interrupting in class, and talking. Claimant apparently had friends at school and got along well with teachers despite his behavioral problems. At home, Claimant lived with his mother and father. He got along well with them except when they told him to do something he did not want to do. He had six half-siblings, all of whom were significantly older than him. None of them lived at home. (Tr. at 475). Claimant had poor concentration and memory, poor sleep habits, anxiety, and depression. Claimant reportedly cried a lot and complained of pain in his legs. He took Adderall, which did help calm him down.

On testing, Claimant had a full scale IQ score of 84. (Tr. at 477). His visual-motor age equivalent tested from 7-6 to 7-11, and his letter-word application, calculations, applied problems and passage comprehension all tested around the 2.6 to 2.8 grade level. (*Id.*). Dr. Steward noted that Claimant's IQ score placed him in the low average range of intellectual ability. His scores on visual-motor testing fell nearly two years below his chronological age, indicating a possible perceptual difficulty. In addition, Dr. Steward indicated that Claimant specifically was below average in several areas of

intellectual abilities including short term memory processing; abstract and concrete reasoning ability in verbal situations; flexibility in new learning situations; ability to sequence letters and numbers; concept formation in visual tasks; and speed of performance, although he was above average in a subtest that measured the ability to use words. (Tr. at 478).

Dr. Steward discussed Claimant's performance on scales used to rate symptoms of ADHD, indicating that he was very much elevated in many of the markers. (*Id.*). He met eight criteria for ADHD predominantly inattentive type and all nine criteria for ADHD predominantly hyperactive-impulsive type, with six needed for the diagnosis of each. (Tr. at 478-79). Based upon these tests and scales, Dr. Steward diagnosed Claimant with ADHD, combined type. (Tr. at 480). He also found Claimant to have problems with concentration. Claimant was given a GAF score of 51.[4]  Dr. Steward recommended that Claimant continue with medication management, that he be taught in an environment as free of distracting stimuli as possible, and that his parents learn parenting techniques in family therapy. The prognosis was guarded. (*Id.*).

Claimant and his parents returned to Dr. Steward's office on October 29, 2009 for follow-up and additional recommendations. (Tr. at 481-489). Dr. Steward conducted additional interviews of Claimant and his parents, reviewed his prior testing and report, and administered additional scales to measure the presence of anxiety, depression, and autism. (*Id.*).

Dr. Steward reviewed Claimant's history, noting that Claimant was brought to the office this time for symptoms of anxiety and depression. (Tr. at 482). He cried a lot

---

[4] GAF scores between 51 and 60 indicate "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

during the evaluation, but appeared to work diligently on the test items; therefore, Dr. Steward felt the test results were valid. Dr. Steward commented that Claimant had developed a series of medical problems related to his asthma. In addition, his leg pain had increased, and he had developed more complaints related to his stomach, as well as constipation.

Through the interviews, Dr. Steward learned that Claimant was nervous all of the time and very dependent on his mother. (Tr. at 483). He had become more physically aggressive toward others and had expressed suicidal thoughts. Claimant still experienced difficulties with sleep. He had also developed problems with eating. He now ate until he vomited, and would then go back and eat more. Claimant spent his time watching television and playing with toys in his bedroom. He was depressed because he was lonely, but did not belong to any clubs. He occasionally went to church, but was unable to sit still and wanted his mother's attention while there. His parents reported that Claimant had not developed peer relationships appropriate to his age; lacked spontaneous sharing of enjoyment and interests with others; was delayed in development of spoken language; used idiosyncratic or repetitive language at times; had abnormal preoccupations with restricted patterns of interest; nonfunctional routines; and persistent preoccupations with parts of objects. (*Id.*).

Based upon the testing performed, Dr. Steward found that Claimant was clearly anxious, likely oversensitive to environmental pressures, and might internalize his anxiety. (Tr. at 486). Claimant also rated very much above average on negative self-esteem and interpersonal problems. Depression scales confirmed that Claimant was depressed. His scores on other scales suggested that Claimant felt socially isolated and was unhappy about his social functioning. (*Id.*). Behavior scales specific for autism fell

within the very likely probability of autism range. (Tr. at 488). Considering the results of these tests and scales, Dr. Steward diagnosed Claimant with depressive disorder, NOS; anxiety disorder, NOS; ADHD, combined type; autistic disorder features; problems with behavior and emotions at home and school, and trouble with grades and concentration at school. (Tr. at 488-89). His GAF score was 44.[5] In summary, Dr. Steward commented that Claimant presented with rather severe anxiety and depression, in combination with ADHD and autistic features. (Tr. at 489). He recommended medication management and monitoring, as well as individual and family counseling and psychotherapy. Dr. Steward felt the prognosis was guarded. (*Id.*).

On April 13, 2010, Claimant and his parents presented to Southern Highlands Mental Health Center ("SHMH") for clinical evaluation and supportive therapy. (Tr. at 520-23). Claimant's parents described him as depressed, aggressive, angry, and easily frustrated, with difficulty separating from his mother and increasing social isolation. Claimant had difficulty sleeping and sitting still. He had developed habits of banging his head and scratching himself. Claimant was also having trouble at school. He was enrolled in regular fourth grade classes, but was failing his courses. Apparently, children at school had started to shun him and call him names like "dork" and "retarded." He frequently got into trouble for interrupting his teachers, and he recently bit another student. According to Claimant's mother, he had a good appetite, although he would eat foods he liked until he vomited. She reported that Claimant's moods fluctuated greatly. He exaggerated and often lied and was difficult to discipline, especially for his mother. (*Id.*). Despite Claimant's problems with anger and aggression, he was kind to animals

---

[5]  A GAF of 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job). DSM-IV at 32.

and wanted to be a veterinarian when he grew up.

The examiner noted that Claimant cried four separate times during the interview, each with a quick onset and rapid recovery. He was talkative and alert. Claimant was fidgety and sometimes rocked in his chair. He stuttered and mispronounced words. In addition, Claimant admitted to having several imaginary friends, although he denied hallucinations, suicidal, and homicidal ideations.  (Tr. at 522).

Claimant saw Dr. Ghassan Birzi, the psychiatrist at SHMH, on April 29, 2010 for ADHD, Autistic Disorder, depression and anxiety. (Tr. at 524-29). His primary problems included mood swings, behavioral issues, anxiety, aggression, disturbed sleep, and poor social interaction. He was taking Adderrall for ADHD and Singular for asthma. After conducting a mental status examination, Dr. Bizri diagnosed Claimant with Asperger Disorder, and a history of ADHD, history of depression, history of anxiety, asthma, and scoliosis. His GAF score was 55, and prognosis was fair to good. Dr. Birzi added some medications and recommended individual psychotherapy. (Tr. at 528-29). Claimant returned to see Dr. Birzi on multiple occasions in 2010 and 2011 for therapy and medication management. (Tr. at 530-534, 586-90).

On June 11, 2012, Claimant was seen by Lauren W. M. Swager, M.D., a child and adolescent psychiatrist affiliated with West Virginia University ("WVU").[6] (Tr. at 618-23). He presented with a history of ADHD, depression, anxiety, Asperger/autism spectrum disorder, and having recently been in the Emergency Department due to ongoing school issues, especially being bullied. In particular, one boy at school repeatedly bullied Claimant, and despite Claimant having reported the bullying, the school administration did nothing. Ultimately, Claimant was suspended for fighting

---

[6] Claimant was also seen by Arashdeep Gill, M.D., a child psychiatry fellow training with Dr. Swager.

with one of the boys that bullied him. Claimant had recently written a suicide note, which was given to a friend who turned it in to school officials. Claimant's mood had improved since school was out for the summer, but his mother reported that he still had poor sleep habits, issues with anger and aggression, decreased self-esteem, mood changes, and difficulty making friends.

Claimant indicated that he had just finished the sixth grade. He was in special education classes for mathematics and reading, but in regular classes for everything else. Claimant's parents brought a letter written by Mr. Steve French, Claimant's teacher, to them in which Mr. French expressed his concern that Claimant was not ready to move on to middle school. Mr. French felt that Claimant's difficulties with mathematics and reading, coupled with his immature behavior, would make adjusting to middle school very difficult. For that reason, Mr. French suggested that Claimant's parents hold him back a year.

Dr. Swager reviewed Claimant's social history, family history, developmental history, medical history, psychological testing, and medication history. She noted that Claimant was not taking any medication at the present time. On examination, Dr. Swager found Claimant to be very sleepy, with immature speech and insight. Otherwise, his affect, thought process and content, and judgment were all age appropriate. She diagnosed Claimant with ADHD, combined type per past records; oppositional defiance disorder, anxiety disorder, rule out mood disorder, rule out pervasive developmental disorder ("PDD") due to past diagnosis of autism spectrum disorder; and asthma. (Tr. at 622). His GAF score was 55-60.

Dr. Swager recommended that Claimant resume taking medication for his ADHD. (Tr. at 623). Because his parents wanted to initiate treatment closer to home,

she did not write any prescriptions, but instead arranged for a case manager to locate a psychiatrist closer to Claimant's home to arrange for his care. Other recommendations were made, but given that treatment would be provided by another psychiatrist, nothing specific in the way of therapy was scheduled. (*Id.*). A plan was made to see Claimant again in about six weeks in case he had not yet arranged for alternative care.

Claimant returned to WVU with his mother on August 9, 2012. (Tr. at 627). According to the record, Claimant, now thirteen years old, presented for the primary complaint of "anger." (*Id.*). Claimant had developed a habit of taking his anger out on his mother by hitting her, regardless of whether or not she was the focus of his anger. Claimant took Prozac in the past, but had negative side effects such as tactile hallucinations (feeling that bugs were crawling on his skin). Moreover, his prior medications did not significantly improve his behavior. After conducting a mental status examination and administering some psychological testing, Dr. Swager prescribed risperidone to treat Claimant's mood irritability and aggression. She commented that Claimant's precise diagnoses still needed to be clarified, but included ADHD, anxiety, and PDD. She provided Claimant's mother with a questionnaire to further investigate the diagnosis of ADHD, counseled her on safety, sleep hygiene, and monitoring issues, and recommended that they return in six weeks if they still had not lined up care closer to home. (Tr. at 629).

Claimant had his first visit with Dr. H. A. Jafary, a psychiatrist in Beckley, on January 30, 2013. (Tr. at 637-39). His primary problem involved bullying at school, which was not being properly addressed by administration. Claimant's mother had decided to take legal action. Dr. Jafary performed a mental status examination that was essentially normal. He diagnosed Claimant with ADHD, OD, anxiety, depression, and

PDD. (Tr. at 639). He gave Claimant a GAF score of 55 and a prognosis of "good with treatment." Dr. Jafary prescribed some medications for Claimant. (*Id.*). At a follow-up visit two weeks later, Dr. Jafary noted that the medications were helping, but Claimant was very anxious over continuing issues at school. (Tr. at 649).

On February 19, 2013, Claimant was evaluated by Kimberly Caudell, M.A., a psychologist at Dr. Jafary's office, to aid with the differential diagnosis. (Tr. at 642-654). Ms. Caudill obtained history regarding Claimant's problems at school, his dependence on his mother, and his attention-seeking behaviors. She reviewed Dr. Steward's records, records from WVU, and Claimant's individualized education plan from the school. Ms. Caudill questioned Claimant's parents about his adaptive functioning and learned that he was fairly independent in personal care and hygiene. He spent most of his time watching television and playing video games. His parents indicated that he was not good about minding his personal safety; for example, he would cross the street without looking. They also mentioned that he had trouble making and keeping friends, and he was bullied almost every day at school.

Ms. Caudill administered another Wechsler Children's Intelligence Scale-IV, which reflected a full scale IQ score of 77. (Tr. at 648). However, Claimant's general ability index score was 93. According to Ms. Caudill, the general ability score accounted for intellectual functioning minus working memory and processing speed, which were typically estimates of ADHD-related symptoms. Therefore, the discrepancy between the scores suggested the presence of ADHD. Various scales completed by Claimant's mother also indicated that Claimant had deficits in multiple functional areas. Ms. Caudill subsequently asked two of Claimant's teachers to complete a Teacher Rating Scale. (Tr. at 651-52). Ms. Modena, Claimant's reading teacher, identified areas of concern in

domains including inattention, hyperactivity, aggression, and especially peer relations. Ms. Worley, Claimant's math teacher, identified areas in which she was "very concerned" as including inattention, hyperactivity, learning problems, aggression, and peer relations. (*Id.*).

At the conclusion of the evaluation, Ms. Caudill diagnosed Claimant with PDD, NOD (provisional); ADHD, combined type; depressive disorder, NOS; and anxiety disorder, NOS. His GAF score was 53. She recommended that Claimant receive medication, ADHD-related services, as well as services for PDD, therapeutic services to address his social skills, and to provide support and coping techniques to lessen his anxiety. (Tr. at 653).

On March 13, 2013, Claimant's mother reported to Dr. Jafary that Claimant was now being schooled at home and was making the honor roll. (Tr. at 658). Claimant was observed by Dr. Jafary to be calm and alert. His medications were thought to be helping; therefore, they were continued. (*Id.*).

### B.  Evaluations for Disability Determination

On April 25, 2010, Dr. Gary Craft performed a physical evaluation of Claimant at the request of the SSA. (Tr. at 498-505). Although the primary focus of the assessment was Claimant's physical condition, Dr. Craft did mention that Claimant recently had been told he might have anxiety, depression, ADHD, and autism, and his parents planned to have him evaluated for those problems later. (Tr. at 500). In light of that information, Dr. Craft noted that Claimant was very alert, very well oriented, and related well to others during his physical examination; had a normal affect; did not exhibit any hyperactivity; had a good attention span; and showed no evidence of autism. (*Id.*).

On July 2, 2010, Tonya McFadden, M.A., completed an adult mental profile of

Claimant for the SSA. (Tr. at 506-11). The profile included a clinical interview, parental interview, and mental status examination. Ms. McFadden recorded Claimant's chief complaints as ADHD, depression, anxiety, and scoliosis. Both Claimant and his mother indicated that his problems began around the age of six and included difficulties at school with other children calling him names. Claimant was described as being very dependent on his mother, with few friends. He had trouble concentrating and sleeping, refused to do homework, was easily distracted and forgetful. Claimant's mental status examination was largely unremarkable, although he appeared anxious. Ms. McFadden diagnosed Claimant with depressive disorder, NOS; anxiety disorder, NOS; PDD, NOS; and history of ADHD, combined type. (Tr. at 510). She commented that Claimant had some autistic-like symptoms, but not to the degree of autism disorder. His prognosis was guarded. (Tr. at 511).

On July 17, 2010, after conducting a review of the records and of the profile prepared by Ms. McFadden, Marcel Lambrechts, M.D., and Holly Cloonan, Ph.D., completed a Childhood Disability Evaluation Form. (Tr. at 512-17). They found that Claimant had impairments of ADHD, combined type; depressive disorder, NOS; anxiety disorder, NOS; PDD, NOS & "autistic disorder features;" history of asthma and scoliosis. They opined that the combination of impairments was severe, but did not meet, medically equal, or functionally equal the Listings. (Tr. at 512). In the specific domains for evaluating functional equivalence, Drs. Lambrechts and Cloonan determined that Claimant had less than marked limitations in acquiring and using information. (Tr. at 514). They indicated that while Claimant had difficulties with mathematics and reading, his verbally based abilities were generally within the normal range and were better than his non-verbal abilities. As far as attending and completing tasks, Drs. Lambrechts and

Cloonan found Claimant to have less than marked limitations, as well, although they commented that he was being treated for ADHD. (*Id.*). Drs. Lambrechts and Cloonan assessed Claimant's limitations in the domain of interacting and relating with others to be less than marked, but noted that he did have some mild difficulties with making friends. They disagreed with the psychologist who felt Claimant had severe deficits in social functioning, pointing to observations by Claimant's teacher, which were inconsistent with such an opinion. Drs. Lambrechts and Cloonan opined that Claimant had no limitations in the domains of moving about and manipulating objects and health and well-being, but did find that he had less than marked limitations in caring for himself. (Tr. at 515). They commented that Claimant did most of his self-care independently, but both his parents and his teacher had some concerns in this domain. (*Id.*). The doctors concluded by stating that Claimant was taking medication for all of his symptoms, and they did not believe that Claimant's parents were fully credible in describing the severity of his impairments. In particular, they noted that the parents provided health care providers with inconsistent information regarding Claimant's symptoms. (Tr. at 517). The opinions of Drs. Lambrechts and Cloonan were affirmed by James Binder, M.D., and John Todd, Ph.D., on October 15, 2010 after they conducted a review of all of the evidence in the file and the completed Childhood Disability Evaluation Form. (Tr. at 580-85).

On November 8, 2011, Claimant was re-evaluated by Dr. Steward at the request of Claimant's attorney. (Tr. at 595-605). Dr. Steward administered a series of psychological tests, interviewed Claimant and his parents, and reviewed Claimant's medical and school records. Dr. Steward found Claimant to be anxious and sad. He cried during the interview, stating that he was ashamed of himself when he heard how badly

he treated his parents. Except for his mood, Claimant's mental status examination was normal, with his attention, concentration, judgment, memory, thought content, and reasoning all falling in the average range. (Tr. at 596). Claimant reported that he was in sixth grade at the local public school and was in special education classes for mathematics and reading. He had a few friends, but had problems with some of the students and had been disciplined for fighting. Claimant did not like doing homework and was depressed a great deal of the time. He consulted with a psychiatrist and took various medications to treat his mood and anxiety. (*Id.*).

Dr. Steward reviewed the records, noting that in April 2009, Claimant took an IQ examination administered by Kelly Robinson, M.A., and received a full scale IQ score of 95. (Tr. at 598). However, Dr. Steward subsequently commented that the full scale IQ score on April 9, 2009 was reported by Ms. Tonya McFadden to be an 84. School records had varied results, but a WISC-IV given in March 2009 by a school psychologist reflected a general ability score of 93. Dr. Steward also discussed a letter sent to Claimant's parents from his fifth grade teacher, Mr. Steve French. Mr. French wrote that he enjoyed having Claimant in his class, but he was very concerned about Claimant being promoted to middle school. Mr. French felt that Claimant did not have sufficient skills to succeed in middle school, pointing out that Claimant currently read and performed mathematics on the first to second grade level. Because his reading and comprehension were significantly behind grade level, Claimant would be hard-pressed to perform well in other curricular areas that required reading and comprehension. In addition, Mr. French described Claimant as being quite small in stature and immature. (Tr. at 598-99). He emphasized that Claimant's problems with bullying might be worse in middle school as the social scene changed. Mr. French advised Claimant's parents

22

that Claimant had very serious problems with mathematics, reading, expressing ideas in written form, focusing and refocusing, completing assignments, completing work accurately without making careless mistakes, and working at a reasonable pace. Furthermore, he had serious problems with comprehending oral instructions; understanding content vocabulary; learning new material; recalling and applying previously learned materials; carrying out multi-step instructions; working without distracting himself or others; and applying problem-solving skills. Obvious problems included understanding and participating in class discussions; providing understandable oral explanations; and organization skills. He had a slight problem paying attention when spoken to directly; sustaining attention during play and sports; playing cooperatively; making friends; seeking attention appropriately; handling frustration appropriately; and carrying out single step instructions. Mr. French stated that Claimant required almost constant one-on-one supervision and often forgot how to do things. He could not retain basic facts and was frustrated. Mr. French asked Claimant's parents to keep Claimant in sixth grade another year, or if they insisted on moving him to middle school, to sign a waiver releasing Mr. French from "all blame for any future education problems that may occur." (*Id.*).

The tests administered by Dr. Steward included a WISC-IV, which again reflected Claimant's full scale IQ to be 84. (Tr. at 600). Dr. Steward commented that the test results were valid and showed that Claimant functioned at the highest level of borderline intelligence. (Tr. at 596, 602). A Wide Range Achievement Test indicated that Claimant was reading and comprehending at a level around the third to fourth grade and performing mathematics computations at a third grade level. (Tr. at 602). Dr. Steward additionally provided a thorough discussion of Claimant's behaviors based upon scales

completed by Claimant and his parents. Based upon all of this information, he concluded that Claimant had PDD, with Asperger's features; ADHD, NOS; depressive disorder, NOS; anxiety disorder, NOS; reading disorder; mathematics disorder; disorder of written expression, and various medical conditions. (Tr. at 605). Claimant's GAF score was 52, reflecting moderate impairments. In summary, Dr. Steward stated that Claimant had a learning disorder, emotional problems, and social problems. He opined that if Claimant were an adult, he would be "permanently" and "totally disabled" from gainful employment, and his prognosis appeared poor for any large, immediate gains. He recommended that Claimant continue with therapeutic intervention. (*Id.*).

VII.   **Discussion**

A.  *Failure to Find Marked Limitations in Three Domains*

Claimant contends that the ALJ committed reversible error when he found that Claimant had "less than marked" limitations in three functional domains—(1) Acquiring and Using Information; (2) Attending and Completing Tasks; and (3) Interacting and Relating to Others—when the evidence clearly supported a finding of "marked" limitations in these domains. (ECF No. 15 at 15). According to Claimant, the ALJ reached erroneous conclusions because he made three significant mistakes in weighing the evidence. First, he improperly discounted the opinion of a treating medical provider, Dr. L. Andrew Steward, and, second, gave too much weight to the testimony of a medical advisor, Dr. Charles Holland, who had never seen or treated Claimant. Third, the ALJ failed to give proper weight to the lay opinion of Claimant's "special education" fifth grade teacher, Mr. Steve French. Instead, the ALJ decided to give greater weight to the opinions of Claimant's fourth grade teacher, even though her contact with Claimant was more remote. Tangentially, Claimant complains that the ALJ gave too much credit to the

24

RFC assessment of Dr. Holly Cloonan, another non-examining agency consultant, and he failed to assess the credibility of Claimant's mother.

### 1. Did the ALJ Weigh Medical Source Opinions Properly?

The regulations provide a framework by which the ALJ must evaluate opinion evidence.  20 C.F.R. § 416.927.  Medical source opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* § 416.927(a)(2). When weighing medical source opinions, an ALJ should generally give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *See* 20 C.F.R. §§ 419.927(c)(1). Even greater weight should be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 416.927(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is supported by clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the claimant's case record. *Id.*; *see also* SSR 96-2p, 1996 WL 374188, at *2 (S.S.A. 1996) (explaining that "'medical opinions' are opinions about the nature and severity of an individual's impairment(s) and are the only opinions that may be entitled to controlling weight."). However, if a treating source opinion is inconsistent with other evidence or internally inconsistent, and the ALJ does not give the opinion controlling weight, the ALJ must determine how much weight to give the opinion based upon certain factors, including:

(1)  The length of the treatment relationship;

(2) The nature and extent of the treatment relationship;

(3) The supportability of the opinion;

(4) The consistency of the opinion;

(5) The area of specialty of the treating source; and

(6) Other factors that may support or contradict the opinion.

20 C.F.R. § 416.927(c). "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188 *4. Nevertheless, a treating physician's opinion may be rejected in whole or in part when there is persuasive contrary evidence in the record. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). When a treating physician's opinion is not given controlling weight, the ALJ "will weigh all of the evidence." 20 C.F.R. §§ 419.927. Every medical opinion will be evaluated and given a particular weight. The weight given to each opinion will be based in large part upon its medical and diagnostic support and its consistency with other opinions and objective medical evidence. *Id.* Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990).

Here, the ALJ had multiple opinions from medical sources spanning several years of Claimant's life. The opinions were consistent in some respects and inconsistent in others. Therefore, after summarizing the medical findings and assessments, the ALJ

26

considered each medical source statement, assigned weight to the opinions that rated the severity of Claimant's limitations, and briefly explained the basis for the weight given. Clearly, the ALJ complied with the relevant regulations by approaching the opinions in this manner.

Claimant correctly contends that the ALJ's determination to give more weight to Dr. Holland's opinions was pivotal to the disability decision. However, Claimant is incorrect in some of his other contentions. Contrary to Claimant's contention, the ALJ did acknowledge the social security regulations and rulings governing the manner in which opinions should be weighed. (Tr. at 37). Moreover, neither the ALJ nor Dr. Holland rejected Dr. Steward's opinions *en toto*. In the written decision, the ALJ extensively reviewed and implicitly accepted Dr. Steward's medical findings, test results, and diagnoses. (Tr. at 38-39). However, the ALJ specifically disagreed with Dr. Steward's severity ratings. (Tr. at 41). As Dr. Steward was a treating source, the ALJ was required to give his opinions controlling weight if the ALJ found the opinions to be "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence of record." 20 C.F.R. § 416.927. The ALJ noted Dr. Steward's opinions that Claimant had "marked impairment regarding social interaction, adaption, sustained concentration, and persistence, and ability to attend to and complete tasks." (Tr. at 41). The ALJ gave these opinions "little weight" because they were "inconsistent with [Dr. Steward's] own findings and with the other evidence of record." (*Id.*). In particular, the ALJ pointed to a notation by Dr. Steward in his most recent evaluation of Claimant where he found Claimant to have "normal" concentration during the mental status examination. The ALJ observed that this medical finding was vastly at odds with Dr. Steward's conclusion that Claimant was

markedly impaired in his ability to concentrate. Moreover, the ALJ remarked that Dr. Steward had a number of inaccuracies and discrepancies in his November 2011 evaluation report that were highlighted by Dr. Holland during his testimony at the administrative hearing, and these inaccuracies and discrepancies were a factor in the ALJ's assignment of weight. Finally, the ALJ indicated that Dr. Steward's opinions contradicted the GAF scores found in the record, as well as the findings of the psychiatrists at West Virginia University, and the opinions of the agency consultants. (*Id.*).

Once again, the ALJ complied with the regulations in that his decision not to give Dr. Steward's opinions controlling weight was based upon a determination that the opinions were not consistent with other substantial evidence in the record, or well-supported by clinical findings. Claimant describes the ALJ's rationale as "cherry-picking" the evidence. (ECF No. 15 at 9-10). However, that characterization ignores a basic truth about the evidence in this case. When looking at the record as a whole, it is fair to say that the evidence most probative to determining the extent and severity of Claimant's functional limitations is inconsistent and contradictory. As Claimant points out, multiple medical providers and examiners generally agree as to Claimant's diagnoses and treatment modalities. Moreover, their psychological testing has yielded fairly compatible results. However, the descriptions and observations of how Claimant functions in several of the domains and in various settings simply do not provide the same constancy. Accordingly, after the ALJ reconciled the evidence and rated the severity of impairment in each domain, he explained his decision by pointing to the evidence he found most persuasive. He also provided his rationale for not accepting the other evidence. Rather than cherry-picking, this is what the ALJ was required to do

according the social security regulations and rulings.

The ALJ likewise adhered to the regulations by explicitly weighing the remaining medical source statements. He gave great weight to the opinions of Dr. Holland, the medical expert who appeared at the administrative hearing. The ALJ explained that Dr. Holland's opinions merited this weight because he was an acceptable medical source; that with the exception of records received after the hearing, Dr. Holland had reviewed the entire file, including an evaluation from West Virginia University completed in 2012, which post-dated Dr. Steward's last contact with Claimant; and his opinions that Claimant had less than marked limitations or no limitations in the six functional domains were supported by the medical evidence. (Tr. at 41). The ALJ also gave some weight to the opinions of Dr. Marcel Lambrechts, Dr. Holly Cloonan, Dr. James Binder, and Dr. James Todd, non-examining agency experts, all of whom opined that Claimant's impairments did not meet, medically equal, or functionally equal the Listings. (Tr. at 43). He found that these experts had familiarity with the Social Security disability program requirements, which made their opinions useful, but he disagreed with some of their statements in light of current medical information and the testimony of Dr. Holland. (*Id.*).

Claimant's criticism that the ALJ gave too much weight to Dr. Cloonan's opinion is likewise not well-founded given that the ALJ afforded the opinion only "some" weight, in part because Dr. Cloonan reached her opinion before the record was complete. The ALJ acted well within his authority to give partial weight to the opinions of the agency consultants. While an ALJ is not bound to accept the opinions of agency consultants, the SSA recognizes that these individuals "are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the

Act." SSR 96-6P, 1996 WL 374180, at *3 (S.S.A. 1996). Thus, opinions from agency consultants should be given weight when they are supported by evidence in the case record, and "[i]n appropriate circumstances ... may be entitled to greater weight than the opinions of treating or examining sources." *Id.,* at *3. The ALJ recognized that the opinions of the agency consultants were somewhat limited in their value due to the date that they were completed, and he took that into consideration when he weighed them. Therefore, the ALJ acted appropriately in weighing Dr. Cloonan's opinion.

### 2.  Did the ALJ Weigh Lay Opinions and Statements Properly?

Claimant also complains that the ALJ erred in his selection of lay witness statements to credit more heavily, and he failed to assess the credibility of Claimant's mother, who testified regarding her son's longstanding difficulties at school. (ECF No. 15 at 13-16). In regard to lay witness statements, Claimant contends that the ALJ should have given more weight to the opinions and statements of Steve French, Claimant's fifth grade teacher, than to the opinions and statements of Rhonda Clark, Claimant's fourth grade teacher, and Ella Donahue, a sixth grade teacher who did not have as much exposure to Claimant as Mr. French. In Claimant's view, it is "backward reasoning" to "take the opinion of a 4th grade teacher over that of a 5th grade teacher." (*Id.* at 16).

The Commissioner may use evidence from non-medical sources "to show the severity of the [claimant's] impairment(s) and how it affects the [claimant's] ability to function." SSR 06-03P, 2006 WL 2329939, at *2; *see also* 20 C.F.R. § 416.913(d). Social Security Ruling 06-03P sets forth the SSA's policy on how opinion evidence from medical sources that are not acceptable sources and from non-medical sources should be considered on the issue of disability. The Ruling makes a distinction between types of "other sources," noting that there are health care providers, who are not acceptable

medical sources, but treat the claimant's medical conditions, and there are non-medical sources, like teachers and rehabilitation counselors, who spend substantial time with the claimant in a professional capacity. As the Ruling explains, both types of sources may provide relevant evidence and have useful opinions:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.
>
> "Non-medical sources" who have had contact with the individual in their professional capacity, such as teachers, school counselors, and social welfare agency personnel who are not health care providers, are also valuable sources of evidence for assessing impairment severity and functioning. Often, these sources have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time . . .

2006 WL 2 329939, at *3. The Ruling additionally provides guidance on how the opinions of these other sources should be weighed, stating that the ALJ should consider the same factors that apply to the opinions of "acceptable medical sources," including: (1) the length of time the source has known the claimant and the frequency of their contact; (2) the consistency of the source's opinion with the other evidence; (3) the degree to which the source provides supportive evidence; (4) how well the source explains his or her opinion; (5) whether the source has an area of specialty or expertise related to the claimant's impairments; and (6) any other factors tending to support or refute the opinion. SSR 06-03P, 2006 WL 2329939, at *4. Not every factor applies in every case, and "[e]ach case must be adjudicated on its own merits based on a

consideration of the probative value of the opinions and a weighing of all the evidence in that particular case." *Id.* at *5.

Furthermore, the Ruling discusses how the ALJ should address other source opinions in the written decision, indicating that "the case record should reflect the consideration of opinions from medical sources that are not 'acceptable medical sources' and from 'non-medical sources' who have seen the claimant in their professional capacity." *Id.* at *6. However, the Ruling acknowledges that "there is a distinction between what an adjudicator generally must consider and what the adjudicator must explain in the disability determination." *Id.* In general, an ALJ "should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at *6.

In the instant case, the ALJ appropriately considered the "other source" statements of Ronda Clark, Steve French, and Ellen Mae Donahue, Claimant's teachers. (Tr. at 41-42). He also expressly weighed the opinions, giving all three "some weight." (Tr. at 42). The ALJ explained that while the teachers were not accepted medical sources, they spent time with Claimant in a professional capacity and had some insight into his impairments. However, to the extent their statements were inconsistent with other evidence in the record, the ALJ did not accept the statements. Consequently, the ALJ complied with the regulations and SSR 06-03P in the manner in which he considered, weighed, and discussed the statements of the teachers.

Moreover, the ALJ properly assessed the credibility of statements made by Claimant's mother. Contrary to Claimant's contention, the ALJ did make a credibility

finding, concluding in his written decision that while Claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, "the statements concerning intensity, persistence, and limiting effects of these symptoms *are not credible* to the extent they are inconsistent with [a] finding that the claimant does not have an impairment or combination of impairments that functionally equals the listings for the reasons explained below." (Tr. at 40-41) (emphasis added). In this passage, the ALJ was undoubtedly referring to statements made by Claimant's mother on Claimant's behalf.

Earlier in the written decision, the ALJ explained the two-step process that he followed when assessing the intensity, persistence, and severity of symptoms that could not be objectively substantiated, such as those associated with emotional distress. According to the ALJ, once he confirmed the presence of an underlying medically determinable physical or mental impairment that could reasonably be expected to cause a claimant's alleged symptoms, the ALJ was required to make a finding based upon the entire case record on the credibility of statements about the intensity, persistence, and severity of the symptoms. The ALJ then identified specific statements at issue in this case, all of which were made by Claimant's mother. (Tr. at 37). He ultimately discounted the credibility of the statements for two main reasons. First, the ALJ pointed out that testimony by Claimant's mother regarding his bullying, which was her primary voiced concern, was directly contradicted by Claimant's three teachers, none of whom felt that Claimant had any significant interaction problems at school. (Tr. at 41). Next, the ALJ found the statements inconsistent with Claimant's evaluations at West Virginia University, which confirmed through Claimant's GAF scores that his functional impairments were moderate to mild, further raising doubt as to the reliability of his

mother's statements. (*Id.*). Thus, the ALJ plainly assessed the credibility of statements made on behalf of Claimant by his mother regarding the severity of his symptoms.

### 3.  Were the Findings Supported by Substantial Evidence?

From a procedural standpoint, then, the ALJ followed the applicable regulations and rulings in making his severity findings. Consequently, the remaining question is whether substantial evidence supports his decision. Using the "whole child" approach in determining childhood disability under the functional equivalence rule, the ALJ must examine the claimant's activities, determine which domains are involved in those activities, and then rate the severity of the limitation in each affected domain.  SSR 09-1P. In his decision, the ALJ reviewed Claimant's activities under each of the six functional domains and determined the severity of Claimant's limitations in each, providing an explanation for the findings. The ALJ found, in relevant part, that Claimant had "less than marked" limitations in the domains of (1) Acquiring and Using Information; (2) Attending and Completing Tasks; and (3) Interacting and Relating to Others. Claimant maintains that he has marked limitations in all three domains. As previously stated, a claimant has a "marked" limitation in a domain when his impairments interfere "seriously with [his] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e). "'Marked' limitation also means a limitation that is 'more than moderate' but 'less than extreme.'" *Id.*

In addressing the domain of "Acquiring and Using Information," the ALJ explained that this area of functioning looked at how well the child was able to perceive, think about, and retain information, and then use that information in various settings. (Tr. at 43). He also provided examples of limited functioning in the domain. After considering the evidence, the ALJ concluded that although Claimant had limitations in

this domain, they were not marked. He indicated that Claimant did receive special education for mathematics and reading, and his fifth grade teacher, Mr. French, felt Claimant had serious issues in this area. However, Claimant's fourth grade teacher, and his sixth grade special education teacher, did not believe his problems were significant. In addition, the ALJ noted that Claimant's IQ was in the low average range, and his level of achievement as documented in his individualized education plan was also low average. Therefore, he was functioning at a level consistent with his level of intelligence. The ALJ also cited to testimony by Claimant's mother that suggested Claimant was progressing appropriately in his education. (Tr. at 44).

Claimant's primary challenge to the ALJ's rationale is his choice of evidence upon which to rely. Claimant argues that the statements of his fifth grade teacher should have been more persuasive than his fourth and sixth grade teachers. Ultimately, the ALJ is responsible for weighing the evidence and resolving conflicts, and the Court will not substitute its judgment for that of the ALJ. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Walker,* 834 F.2d at 640; *see also Hays,* 907 F.2d at 1456. Thus, even if the Court disagrees with the Commissioner's decision, if the law was properly applied and the findings are supported by substantial evidence, the Court must adopt them. *Blalock,* 483 F.2d at 776. Two of Claimant's teachers found no major issues with his ability to acquire and use information. Claimant's fourth grade teacher opined that he had ***no*** problems in that particular functional area, and Ms. Donahue, his current special education teacher in mathematics, found no more than a moderate problem. (Tr. at 334, 420). It is true that Ms. Donahue qualified her answer by stating that she "never taught James in

this area," but she obviously was referring to the questions dealing with reading and writing. She answered the questions pertaining to mathematics, which provided relevant and useful information to the ALJ given that mathematics was one of Claimant's known weaknesses. The ALJ determined that the findings supplied by Claimant's two teachers were more consistent with the rest of the record than the findings provided by Claimant's fifth grade teacher. (Tr. at 42). That determination is supported by substantial evidence. Dr. Holland and the agency experts agreed that Claimant had less than marked limitations in this domain. Moreover, most of Claimant's mental status examinations noted that his thought content and process were age appropriate, and his GAF scores reflected moderate to mild symptoms. Claimant was independent in his grooming and hygiene. He was able to play video games. Records submitted to and considered by the Appeals Council demonstrated that when Claimant began homebound schooling, his grades improved to the point where he was making the honor roll. (Tr. at 658). Therefore, even this most recent evidence supported a finding of less than marked limitations in this domain.

In regard to the domain of "Attending and Completing Tasks," the ALJ discussed the types of activities that exemplify a child's ability to attend to and complete tasks, correctly relying upon SSR 09-4p and 20 C.F.R. § 416.926a. According to the ALJ, this domain focuses on a child's ability to pay attention when spoken to directly, to concentrate on tasks, prioritize, and mange time. The ALJ noted that the evidence was not in accord on the Claimant's abilities in this domain. Once again, the ALJ looked at the questionnaires completed by the teachers and found that Claimant's fourth grade teacher observed at most only slight problems in his ability to attend to and complete tasks. (Tr. at 335). However, Claimant's fifth and sixth grade teachers found his

36

deficiencies to be more limiting. (Tr. at 370, 421). Claimant's mother indicated that he could keep busy on his own and liked to work on art and crafts projects. In addition, the ALJ relied upon Dr. Holland, who opined that Claimant's limitations in this area were less than marked.

Once more, Claimant's criticism with the ALJ's decision is based entirely on how he weighed the evidence. Claimant argues that the ALJ should have given more weight to the two teachers who found Claimant to have more severe limitations in this functional domain. Reviewing the ALJ's finding against the record, the undersigned finds that substantial evidence supports the ALJ's determination. It is undisputed that Claimant has ADHD, which certainly affects his ability to attend to and complete tasks. Even still, the record demonstrates that Claimant is capable of attending to and completing tasks in an age-appropriate manner. For instance, Claimant repeatedly took and completed a battery of psychological tests. He was described as "a persistent worker when given visual aids or concrete materials to manipulate," (Tr. at 407), and as "trying diligently on the test items." (Tr. at 482). He spent much of his time watching television and playing video games, and his mother conceded that he concentrated better when doing those activities. At his counseling sessions, he was generally noted to be alert and oriented, with good eye contact, a normal attention span, and normal concentration. Most of the counselors and evaluators commented that they had good rapport with Claimant, and the session records show that he remained engaged throughout the appointments. Many of the examiners' notes could not be reconciled with the picture of Claimant painted by his mother. A good example is the record of examination prepared by Dr. Gary Craft, who wrote:

> The parents state they recently were told that [Claimant] may have

> anxiety, depression, ADHD, and autism and later will be evaluated for these problems. During this examination, he was very alert, very well oriented, and related well to other people. He had a normal affect. He did not exhibit any hyperactivity. He had a good attention span, I could not detect any evidence of autism.

(Tr. at 500). Finally, records supplied to and considered by the Appeals Council further support the ALJ's finding in this domain. Treatment records from Dr. Jafary show that Claimant was doing well on medication for his ADHD, his concentration and attention were adequate during testing, and that with homebound schooling, he was doing "great" and was "making the honor roll." (Tr. at 637-654, 658). Clearly, the most recent records confirm that he was able to concentrate sufficiently on his studies.

As to the third domain of "Interacting and Relating to Others," Claimant contends that the ALJ's finding of "less than marked" limitations is plainly wrong in view of the ample evidence corroborating the bullying suffered by Claimant over a period of several years. In this domain, the ALJ evaluates the "child's ability to initiate and respond to exchanges with other people, and to form and sustain relationships with family members, friends, and others." SSR 09-5p, 2009 WL 396026, at *2 (S.S.A. Feb. 17, 2009). This domain looks at all aspects of social interaction at home, at school, and in the community; with individuals and groups; and includes considerations such as compliance with rules, response to authority figures, and respect for others' possessions. *Id.* In assessing the severity of Claimant's impairments in this domain, the ALJ acknowledged Claimant's problems with bullying. However, the ALJ commented that Claimant's teachers reported him having little to no problems interacting and relating with others. He was described as "sweet," "good-natured," and "cooperative" by his teachers. In addition, at examinations and evaluations, the clinicians generally had no difficulty establishing rapport with Claimant. Lastly, the ALJ relied upon the testimony

38

of Dr. Holland, who opined that Claimant's limitations in this domain were not marked.

The ALJ's determination is supported by substantial evidence. Certainly, there is evidence that Claimant has deficits in his ability to get along with others; particularly, with other children and his mother. Nonetheless, there is sufficient evidence to validate the ALJ's conclusion that Claimant's difficulties in this domain are not marked. All three of Claimant's teachers rated him as having slight to no problems in twelve out of thirteen different activities in this domain. (Tr. at 336, 371, 422). All three confirmed that no behavior modification had been necessary. (*Id.*). Claimant got along well with his teachers and had no trouble forming bonds with the school counselor and the psychologists evaluating him. He also had good relationships with his older half-siblings, and was quite attached to his mother although he tended to take out his frustration on her. While he had problems with some of the children at school, he also had friends there and at times was happy with his situation. (Tr. at 459, 475, 482, 500, 595, 596, 635).

Having thoroughly reviewed the record and the arguments of the parties, the undersigned **FINDS** that the ALJ properly weighed the opinions of Dr. Steward, Dr. Holland, and the agency consultants; evaluated the credibility of the statements made by Claimant's mother regarding the severity of his functional limitations; and provided a sufficient explanation of the evidence to fully understand the basis of his determination. The evidence before the ALJ contained discrepancies and differences of opinion. As previously stated, when conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled," the responsibility for making the decision belongs to the Commissioner. *Walker,* 834 F.2d at 640. "Thus, it is not within the province of the reviewing court to determine the weight of the evidence, nor is it the court's function to

substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence." *Richardson v. Colvin*, No. 8:12-cv-03507-JDA, 2014 WL 793069, at *s (Feb. 25, 2014). The undersigned further **FINDS** that the decision of the ALJ that Claimant does not functionally equal the Listings is supported by substantial evidence.

### B.   Failure of Appeals Council to Remand the Case Based on New Evidence

After the ALJ's written decision was issued, Claimant submitted additional materials to the Appeals Council, which the Council explicitly incorporated into the record and considered before denying Claimant's request for review. (Tr. at 1-2, 5). The Appeals Council advised Claimant that the new materials did not provide a basis for changing the ALJ's decision, but did not elucidate further. (*Id.* at 2). Claimant contends that the Appeals Council erred given that the submitted information corroborated the testimony of Claimant's mother regarding his difficulties at school and substantiated the diagnoses of Dr. Steward, which had been given little weight by the ALJ. (ECF No. 15 at 19-24).

A claimant may submit evidence at any stage of the disability determination process. If new and material evidence is submitted to the Appeals Council when the ALJ's decision is before it on a request for review, the Appeals Council may accept the evidence and incorporate it into the record. In that event, the Appeals Council will consider the new evidence when deciding whether to grant the claimant's request for review. However, if the Appeals Council denies the request for review, there is no requirement that it explain to the claimant its reasoning for the denial. *Meyer v. Astrue*, 662 F.3d 700, 705–06 (4th Cir. 2011). As a result, the claimant may never

receive a written decision that weighs and reconciles the newly submitted evidence.

On judicial review, the court must "'review the record as a whole' including any new evidence that the Appeals Council 'specifically incorporated ... into the administrative record.'" *Id.* at 704 (alterations in original) (quoting *Wilkins v. Sec'y, Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991)). If in light of the new evidence, the court is unable to determine whether the Commissioner's decision is supported by substantial evidence, or the "other record evidence credited by the ALJ conflicts with the new evidence," remand is necessary to give the fact finder a chance to consider, weight, and "reconcile that [new] evidence with the conflicting and supporting evidence in the record." *Meyer,* 662 F.3d at 707. On the other hand, "when a review of the new evidence submitted to the Appeals Council still allows the conclusion that substantial evidence supports the ALJ's decision, the ALJ's denial of benefits should be affirmed." *Smith v. Chater,* 99 F.3d 635, 638–39 (4th Cir. 1996).

The additional evidence provided by Claimant included session notes prepared by a school counselor pertaining to conversations with Claimant; a letter from Claimant's fifth grade teacher, Mr. French; the January 12, 2008 evaluation completed by Dr. Steward; the February 19, 2013 evaluation performed by Kimberly Caudill of Dr. Jafary's office; and 2013 office notes prepared by Dr. Jafary. Contrary to Claimant's contention, it is unlikely that this evidence would have changed the ALJ's assessment of Dr. Steward's opinion, or altered the decision of nondisability. First, the conversations with the school counselor tend to support the ALJ's finding that Claimant had less than marked limitations in the domain of interacting with others. (Tr. at 459-462). The counselor wrote that Claimant was "cooperative, cheerful, open." Claimant described episodes of bullying as "not that bad." He was communicative, and

41

discussed college and careers. (*Id.*). Although he had some "ups and downs," Claimant freely shared his concerns with the counselor and was noted to enjoy the conversations. (Tr. at 462).

Second, the letter from Mr. French was duplicative of information already in evidence. Although the letter itself was not submitted until after the hearing, Dr. Steward had reviewed a copy of the letter and quoted it almost verbatim in his November 2011 evaluation. The letter was discussed by Dr. Holland in his testimony. Accordingly, the substance of Mr. French's letter was known to the ALJ, and he assigned a specific weight to opinions in the letter as part of considering Mr. French's overall statements.

Third, the evaluation performed by Ms. Caudill and the office records of Dr. Jafary do not provide significantly new information. Claimant contends that the records are important because they corroborate Dr. Steward's diagnoses, which the ALJ rejected. However, that is not a fair or accurate portrayal of the written decision. The ALJ never rejected the diagnoses, medical findings, or observations of Dr. Steward. In fact, the ALJ thoroughly summarized and accepted Dr. Steward's diagnoses and findings as part of the analysis of the functional severity of Claimant's impairments. (Tr. at 38-39). The ALJ only discounted the weight he attributed to Dr. Steward's medical source statement that Claimant had marked impairment in social interaction, adaption, concentration, persistence, and ability to attend to and complete tasks, as well as Dr. Steward's statement that if Claimant were an adult he would be "permanently and totally disabled from any type of gainful employment." (Tr. at 41). Nothing in Ms. Caudill's evaluation bears directly on those medical source statements. Ms. Caudill does make a provisional diagnosis of pervasive developmental disorder,

NOS; however, the question of autism spectrum disorder was raised in the West Virginia University records, as well as in Dr. Birzi's and Dr. Steward's records. Much of Ms. Caudill's report is simply a re-hashing of the same information previously presented to the ALJ. Similarly, the January 2008 assessment by Dr. Steward provided no new insights as it consisted simply of a history and mental status examination.

Finally, the office records prepared by Dr. Jafary actually supported the ALJ's conclusions. (Tr. at 637-41, 658). On the initial visit, Dr. Jafary found no gross deficits in Claimant's attention and calculation; Claimant's speech, thought content, thought process, appearance, mood, and affect were all noted to be normal; and his insight and judgment were not grossly impaired. (Tr. at 637-39). Dr. Jafary felt Claimant had a good prognosis with treatment, and he needed to be on medications. By the second visit, Claimant was showing some benefit from the medication and was described as alert and calm. (Tr. at 640). Dr. Jafary thought Claimant should be assessed for possible Asperger syndrome,[7] and he was continued on his medications. By Claimant's third visit in March 2013, he was found to be psychiatrically stable on his medication regimen. (Tr. at 658). He was calm and alert. His mother reported he was "making honor roll with homebound schooling," and he was doing "great with his school work." (*Id.*). Consequently, these additional records would not reasonably have changed the ALJ's analysis in this case.

Therefore, the undersigned **FINDS** that the new evidence supplied by Claimant to the Appeals Council does not create the need for remand. The new evidence does

---

[7]   Asperger syndrome is an autism spectrum disorder (ASD) associated with social and communication deficits, fixated interests, and repetitive behaviors. The severity of communication and behavioral deficits, and the degree of disability, is variable in those affected by ASD. *"Asperger Syndrome Fact Sheet,"* NIH Publication No. 13-5624 (October 2012). National Institute of Neurological Disorders and Stroke. National Institutes of Health.

not conflict with the evidence considered by the ALJ, nor does it significantly alter the basis of any of his findings. Having fully considered the record as a whole, including the new evidence, the undersigned further **FINDS** that the decision of the ALJ is supported by substantial evidence.

## VIII.   <u>Proposal and Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's Motion for Judgment on the Pleading, (ECF No. 15), **GRANT** Defendant's Motion for Judgment on the Pleading, (ECF No. 16); **AFFIRM** the decision of the Commissioner, **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S.

140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Faber and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**: January 26, 2015

Cheryl A. Eifert
United States Magistrate Judge

45